**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION
Case No.:_____

WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION; an Oregon Corporation, and SHELL VACATIONS, LLC, an Arizona limited liability company,

      Plaintiffs,

v.

CLS, INC. d/b/a ATLAS VACATION REMEDIES and also d/b/a PRINCIPAL TRANSFER GROUP, a Missouri corporation; DONNELLY SNELLEN, an individual; JASON LEVI HEMINGWAY, an individual; CLAPP BUSINESS LAW, LLC, a Missouri limited liability company; MARY CLAPP, ESQ., an individual; THE TRANSFER GROUP, LLC, a Missouri limited liability company; VACATION CONSULTING SERVICES, LLC, a Missouri limited liability company; VCS COMMUNICATIONS, LLC, a Missouri limited liability company; BRIAN SCROGGS, an individual; TRANSFER FOR YOU LLC, a Missouri limited liability company; ALLIED SOLUTION GROUP, LLC, a Missouri limited liability company; JJ MIDWEST MARKETING LLC, a Missouri limited liability company; JJ&C MARKETING, LLC, a Missouri limited liability company; THE MID-WEST TRANSFER, LLC, a Missouri limited liability company; MIDWEST TRANSFERS LLC, a Missouri limited liability company; JOSH UNGARO, an individual; MUTUAL RELEASE CORPORATION a/k/a 417 MRC LLC, a Missouri limited liability company; DAN CHUDY, an individual; MATTHEW TUCKER, an individual; CATALYST CONSULTING FIRM LLC, a Missouri limited liability company; REAL TRAVEL, LLC, an Arkansas limited liability company; and BART BOWE, an individual,

      Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); and Shell Vacations, LLC ("SV") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants, and state as follows:

### A. BACKGROUND ON THE TIMESHARE INDUSTRY AND DEFENDANTS' TARGETED AND NEFARIOUS SCHEME

1.      Timeshare properties, also known as vacation rentals, revolutionized the vacation and travel industry and have been a popular option for families for decades.  Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

2.      The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Wyndham, can divide a single vacation unit between 52 owners, with each owner purchasing fractional interest of the whole for a specified share of the total price, i.e. deeded ownership.  Developers, like Wyndham, also sell membership interests to consumers in the form of points, which, in turn, are exchanged for use at Wyndham properties. Wyndham owners may also belong to a Wyndham program called 'Club Wyndham Plus', which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

3.      This concept has allowed consumers an incredible opportunity to enjoy regular vacations at the fraction of the typical cost and without the burdens associated with undivided vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee,

timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

4.      Today, the timeshare industry continues to thrive.  As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers."  As of 2016, 9.2 million households in America were timeshare owners.

5.      Recently, however, a nefarious cottage industry known as "timeshare exit" has sprouted.  This insidious industry preys upon unsuspecting timeshare owners, inducing them into breaching their binding timeshare contracts, causing both the consumers and timeshare developers, like Wyndham, grave harm.

6.      These timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as the Wyndham Ovation® program.

7.      Defendants, acting in concert, have engaged in a scam to take advantage of timeshare owners and cause Wyndham, its business, and its established brand millions of dollars in damages.  Defendants maliciously and purposefully act, using shell companies and websites, as well as lawyers and sham law firms that are really lawyer referral services and improperly related to non-lawyer 'marketing' firms, to divert or to otherwise hide, and abscond with funds from consumers that own Wyndham timeshare products ("Wyndham Owners") and interfere

with the current and prospective contractual relationships between Wyndham Owners and Wyndham.

8.      Defendants engage in extensive and prolific false advertising, make untrue statements and deceptively misleading empty promises, and guarantee success or specific results that they cannot – and do not – deliver to unsuspecting timeshare owners (including Wyndham Owners), while surreptitiously extracting exorbitant, unwarranted fees for illusory services – fees that otherwise would have been used to pay Plaintiffs for amounts properly owed to them.

9.      Defendants' misdeeds and practices have caused significant financial and reputational damage to Wyndham.  In addition to lost revenues, Wyndham is further damaged by the loss of goodwill to its customer base whom may be required to pay more maintenance and/or annual fees than contemplated due to non-payment by others, and tarnishment of Wyndham's reputation and brand, as well as lost revenue associated with the loss of repeat business, referrals, and upgrades by existing Wyndham Owners, and the costs, losses, and fees related to the substantial resources utilized and expended to address the results of Defendants' actions.

10.      Wyndham has no other option but to actively and aggressively seek justice for itself, as well as injunctive relief to thwart Defendants from inflicting further and ongoing damage to Wyndham's business and, most importantly, its relationships with Wyndham Owners.

**B.      OVERVIEW OF THE COMPLAINT**

11.      In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Further, as a concomitant effect, Wyndham is also protecting from further harm the Wyndham Owners, and timeshare owners at large, who have

been negatively impacted by Defendants' wrongful conduct, and otherwise positively impacting the timeshare industry.

12.     Wyndham institutes this action to halt the Defendants' misconduct, recoup its damages, preserve its goodwill in its customer base and brand strength, and to deter future improvident conduct against Wyndham and the Wyndham Owners, whose relationships with Wyndham are being decimated as a direct result of Defendants' nefarious and unlawful actions.

### C.   PARTIES, JURISDICTION, AND VENUE

#### a.   The Plaintiffs

13.     Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

14.     Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

15.     Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

16.     Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

#### b.   The Defendants

17.     A better understanding of how the Defendants are all interlinked (as set forth herein below) can be obtained through reference to Exhibit 1.

18.     CLS, Inc. is a corporation organized and existing under the laws of the State of Missouri with an alleged principal place of business at 6906 Route M, Jefferson City, Missouri 65101.  A copy of the Missouri Secretary of State information for CLS, Inc. is annexed hereto as Exhibit 2.  In reality, CLS operates, through at least its two fictitious names set forth herein below, out of 901 E St. Louis Street, Suite 1201, Springfield, Missouri 65806 (the "Springfield Address").

19.     CLS owns at least two fictitious names: 'Atlas Vacation Remedies' and 'Principal Transfer Group'.  Copies of the fictitious name registrations filed with the Missouri Secretary of State are annexed hereto as Exhibits 3 and 4, respectively.

20.     Donnelly Snellen ("Snellen") is an individual and resident of the State of Missouri.  According to the Cole County property records, Snellen is the owner of the real property located at 6906 Route M, Jefferson City, Missouri 65101, which is a single-family, two bedroom, one bathroom home.  Copies of the relevant records are annexed hereto as Composite Exhibit 5.  Snellen is also listed as the owner of CLS and, therefore, the owner of the fictitious names 'Atlas Vacation Remedies' and 'Principal Transfer Group'.  Snellen used to be employed by co-defendant Vacation Consulting Services, LLC, which is owned by co-defendant Brian Scroggs, as a customer service consultant.

21.     Jason Levi Hemingway ("Hemingway") is an individual and resident of the State of Missouri.  Hemingway was formerly committed to the Missouri Department of Corrections and may presently be reached through, at least, his parole officer, Jennifer Kimberlin, at 2530 South Campbell, Suite H, Springfield, Missouri 65807.  According to court records, Hemingway may reside at 4501 West Westwood Drive, Battlefield, Missouri 65619.

22.     Clapp Business Law, LLC ("Clapp Law") is a limited liability company organized and existing under the laws of the State of Missouri with an alleged principal place of business located at 636 West Republic Road, Suite A116, Springfield, Missouri 65807.  In reality, Clapp Law operates out of Suite F104 at that same address.  A copy of the Missouri Secretary of State information for Clapp Law is annexed hereto as Exhibit 6.  Photographs from Google Street View® showing the actual location of Clapp Law is annexed hereto Composite Exhibit 7.

23.     Mary Clapp, Esq. ("Clapp") is an individual and resident of the State of Missouri, and is otherwise *sui juris*.

24.     The Transfer Group, LLC ("Transfer Group") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 7.  A copy of the Missouri Secretary of State information for Transfer Group is annexed hereto as Exhibit 8.

25.     Vacation Consulting Services, LLC ("Vacation Consulting") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 7.  A copy of the Missouri Secretary of State information for Vacation Consulting  is annexed hereto as Exhibit 9.

26.     VCS Communications, LLC ("VCS") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 636 West Republic Road, Suite F100, Springfield, Missouri 65807.  *See* Composite Exhibit 7.  A copy of the Missouri Secretary of State information for Vacation Consulting is annexed hereto as Exhibit 10.  VCS is an alter-ego of Vacation Consulting and Brian Scroggs.

27.     Brian Scroggs ("Scroggs") is an individual and resident of Nixa, Missouri, and is otherwise *sui juris*.

28.     Transfer For You LLC ("Transfer For You") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 402B W Mt. Vernon Street, #112, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for Transfer For You is annexed hereto as Exhibit 11.

29.     Allied Solution Group, LLC ("Allied") is a limited liability company organized and existing under the laws of the State of Missouri with an alleged principal place of business located at 1875 N Calhoun Avenue, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for Allied is annexed hereto as Exhibit 12.  In reality, Allied has an actual address at 1335 E Republic Road, Suite D, Springfield, Missouri 65804.  A copy of a Google Street View® photograph showing the actual location of Allied is annexed hereto as Exhibit 13.

30.     JJ Midwest Marketing LLC ("JJ Midwest Marketing") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 1885 N Hwy CC, Suite A, Nixa, Missouri 65714.  A copy of the Missouri Secretary of State information for JJ Midwest Marketing is annexed hereto as Exhibit 14.

31.     JJ&C Marketing, LLC ("JJ&C Marketing") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 1335 E Republic Road, Suite F, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for JJ&C Marketing is annexed hereto as Exhibit 15.  Suite F at 1335 E Republic Road in Springfield, Missouri is a business named 'Ship It', which provides mailbox services.  In reality, JJ&C Marketing operates out of the same location as Allied, The

Mid-West Transfer, LLC ("The Mid-West Transfer") and, upon information and belief, many of the other defendants.

32.     The Mid-West Transfer is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business allegedly located at 1335 E Republic Road, Suite F, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for The Mid-West Transfer is annexed hereto as Exhibit 16.  In reality, The Mid-West Transfer is located in Suite D at that same address as Allied.  *See* Exhibit 13.

33.     Midwest Transfers LLC ("Midwest Transfers") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 4121 S Fremont Avenue, Suite 120, Springfield, Missouri 65804.  A copy of the Missouri Secretary of State information for Midwest Transfers is annexed hereto as Exhibit 17.

34.     Josh Ungaro ("Ungaro") is an individual and resident of the State of Missouri and is otherwise *sui juris*.

35.     Mutual Release Corporation a/k/a 417MRC, LLC ("MRC") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 901 E St. Louis Street, Suite 1201, Springfield, Missouri 65806 (a/k/a the Springfield Address).  A copy of the Missouri Secretary of State information for MRC is annexed hereto as Exhibit 18.

36.     Dan Chudy ("Chudy") is an individual and citizen of the State of Missouri.  Upon information and belief, Chudy maintains addresses at 798 Showplace Gateway, Branson, Missouri 65616 and/or 372 Crocodile Avenue, Sparta, Missouri 67573.

37.     Matthew Tucker ("Tucker") is an individual and citizen of the State of Missouri. Upon information and belief, Tucker maintains addresses at 2000 W Murray Drive, Springfield, Missouri 65810 and/or 1344 E Woodland Street, Springfield, Missouri 65804.

38.     Catalyst Consulting Firm LLC ("Catalyst") is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 901 E St. Louis Street, Suite 1205, Springfield, Missouri 65806, the office suite next to Tucker, Chudy, MRC, Snellen, and CLS's businesses – Atlas Vacation Remedies and Principal Transfer Group.  Clapp is the registered agent for Catalyst and is the sole organizer of Catalyst. A copy of the Missouri Secretary of State information for Catalyst is annexed hereto as Exhibit 19.

39.     Real Travel, LLC ("Real Travel") is a limited liability company organized and existing under the laws of the State of Arkansas with a principal place of business located at 1202 NE McClain Road, Bentonville, Arkansas 72712.  A copy of the Arkansas Secretary of State information for Real Travel is annexed hereto as Exhibit 20.  Real Travel was formed by, and is owned by, Scroggs and Bart Bowe.

40.     Bart Bowe ("Bowe") is an individual and resident of the State of Missouri and is otherwise *sui juris*.

## b. <u>Subject Matter Jurisdiction</u>

41.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

c.   **Personal Jurisdiction**

42.     This Court has personal jurisdiction over the Defendants for the following reasons:

a.      over Clapp and Clapp Law because Clapp is an attorney registered with the Florida Bar and the managing partner of Clapp Law, which has a business address located at 9940 Town Center Parkway, Lakewood Ranch, Florida 34202; Clapp and Clapp Law also direct correspondence to Wyndham in Orlando, Florida;

b.      over all other Defendants because their actions, as more fully described herein below, are directed at consumers across the country, including consumers in the state of Florida.  All Defendants operate websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter alia*, the repeated transmission of files over the Internet in to and out of the State of Florida.  These activities are not isolated or limited, and are purposefully directed towards consumers in the state of Florida; and

c.      over all Defendants as they operate together and cause false demand letters to be directed to Wyndham in the State of Florida, indeed, all actions of Defendants are designed to interfere with Wyndham's business, which involves the repeated use of the wires and mails by Defendants to transmit correspondence and other items into the State of Florida.

43.     For the foregoing reasons, the Court has personal jurisdiction over all Defendants.

### e.  Venue

44.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, the ultimate entity through which Defendants ultimately harm the consuming public and Wyndham is Clapp and Clapp Law, a Florida attorney and Florida-registered law firm, respectively, and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

### f.  Conditions Precedent, Attorneys' Fees

45.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

46.     Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 35 U.S.C. § 1117 and other statutes, as set forth in greater detail herein.

### D.  NATURE OF THE ACTION

47.     This Complaint requests damages and injunctive relief for violation of the Lanham Act 15 U.S.C. § 1125(a)(1) prohibiting misleading and false advertising, Intentional Interference with Contractual Relations, Intentional Interference with Advantageous Business Relationships/Prospective Economic Advantage, Civil Conspiracy, and violation of the Florida Deceptive and Unfair Trade Practices Act.

### E.  THE WYNDHAM ENTITIES

48.     Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

49.     Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and Shell Vacations LLC.

50.     Wyndham devotes substantial resources to advertising and other marketing promotions in an effort to maintain and enhance the value of their established and famous brands.

51.     As part of its business, WVR, WRDC and SV enter into timeshare contracts with consumers (e.g., the Wyndham Owners).  At the time owners purchase timeshares from WVR, WRDC, and/or SV, the owners execute Contracts for Purchase and Sale wherein the owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to the Plaintiffs for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the owners agree to pay a pro-rated share of the property taxes to Plaintiffs which is then submitted by Plaintiffs to the appropriate local tax collectors.  Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement.  These timeshare contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

52.     Wyndham Hotels and Resorts, LLC ("WHR", f/k/a Wyndham Hotels and Resorts, LLC and formerly a sister company to WVO), owns, maintains and manages a portfolio of Wyndham related intellectual property.  These intellectual property assets are utilized to market

the Wyndham brand. Wyndham devotes significant resources to advertising and other marketing promotions to maintain and enhance the value of its brands. Wyndham has made and continues to make ongoing financial investments in the development and improvement of its products and services, and, further invests resources to preserve and enhance its brand value and the goodwill associated with its products and services. Indeed, visibility and recognition of its brand products and services is a key component to Wyndham's business model. Wyndham competes directly with other marketers of resort products who share a similar consumer base.

### F.  THE THIRD PARTY EXIT COMPANY ("TPE") SCAM

53.     Following the late 2007 recession, a small group of individuals hatched a plan to unscrupulously prey on timeshare owners affected by the economic downtown. These individuals seek economic gain at the expense of timeshare owners and timeshare developers, like Wyndham. Developers, such as Wyndham, are specifically targeted due to their size, the sheer number of Wyndham Owners, and number of Wyndham branded and managed properties throughout the U.S. and abroad.

54.     These individuals, working together, have formed a relatively new underground sub-industry dubbed "third party exit companies" or "TPEs", "PPEs", or "affiliates".

55.     These various individuals and their TPEs, saw an opportunity to make fast cash from those suffering from the aftermath of the late 2007 recession and without the means to make regular timeshare payments.

56.     Although there are variations of the TPE scam, the TPEs (often owned and managed by unsavory individuals) offer and allegedly provide timeshare interest "transfer" and/or "exit" (i.e. termination of existing contracts) services with respect to consumer resale of timeshare interests in timeshare properties.

57.     Through various forms of deceptive advertising, including, without limitation, direct mailings and other communications crossing state lines, "data mining" on the internet, as well as inappropriate, unsolicited, direct contact with a timeshare developer's owners, TPEs and/or their marketing firms make false statements about developers and/or the timeshare owners' timeshare interests, provide deceptively misleading information to timeshare owners, and otherwise instruct owners to breach their contracts and stop payments on their timeshare agreements and/or maintenance fees, many times through creative "talking points" luring these individuals to act through a "pitch."

58.     These TPEs often charge consumers exorbitant upfront fees while failing to disclose to consumers what, exactly, the timeshare exit company will do for the consumer.  In fact, TPEs frequently mislead consumers, either through blatantly false statements, or statements that, while potentially literally true, are deceptively misleading or only partially true.  For example, timeshare exit companies frequently state or imply that they have some sort of 'method' or 'special method' to assist consumers in 'exiting' their timeshare contracts.  TPEs also frequently state or imply that consumers need to retain them because of their 'method' and that it will provide consumers with an advantage of some type in attempting to cancel their timeshare contracts.  More specific examples of Defendants' false and/or deceptively misleading statements are detailed herein.  In reality, these TPEs have no method of helping consumers exit their timeshare contracts as no such method exists separate and apart from any program a timeshare company may choose to offer direct to consumers.

59.     What these companies frequently do is fail to disclose to the consumers that they will, in fact, do very little, if anything, for the consumer and frequently force the consumer's timeshare interest into default and eventually foreclosure, after which the TPE claims that it

helped the consumer "exit" their timeshare contract.  Frequently, the consumer is not aware that their timeshare interest was actually foreclosed and their credit rating adversely impacted.  In sum, consumers are persuaded to pay TPEs for illusory services.

60.     Another frequent variation of the TPE scheme is to fraudulently transfer a customer's timeshare interest via quitclaim deed, or other instrument that has not been approved by the timeshare developer, to a third-party or strawman buyer who then fails to make payments on the timeshare interest as required.  Because the transfer was not approved, the resort developer looks to the original owner of the timeshare interest for payment while the original owner is completely unaware that they are still the legal owner of their timeshare interest.

61.     For illustrative purposes, a common form of the TPE scheme works as follows. The timeshare exit company solicits timeshare owners, promising that the timeshare exit company can help the timeshare owner 'effectively' or 'legally' exit their timeshare contract. The timeshare exit company extracts an up-front payment (sometimes financed over time by the timeshare exit company itself) from the consumer.  The timeshare exit company then uses an attorney to send a demand letter to the timeshare company – this attorney is retained directly by the timeshare exit company, *not* the consumer, but purports to represent the consumer.  The demand letters usually state that the consumer wishes to cancel their timeshare, sometimes cite to irrelevant legal decisions, and tell the timeshare developer not to contact the consumer. Sometimes the demand letters reference the Fair Debt Collection Practices Act to further prevent any communication from the timeshare developer to the timeshare owner.  Simultaneously, the timeshare exit company directs the timeshare owner not to speak to the timeshare developer, make no further payments on any outstanding loans and/or not to pay maintenance fees.  Thus, the timeshare exit company has prevented the timeshare developer and timeshare owner from

communicating with each other while directing the timeshare owner to take actions that will result in the timeshare owner defaulting on their timeshare contract and, eventually, a foreclosure of that interest.   After the foreclosure, the timeshare exit company will claim it helped the consumer 'exit' their timeshare contract and refuse to refund any monies pursuant to the guarantees that were made to the consumer.

62.     In sum, these TPEs charge timeshare owners exorbitant fees under the auspices that they will get them out of their timeshare contracts, but the services are illusory.   They usually target large timeshare developers, like Wyndham, using unsuspecting timeshare owners as a vehicle to damage Wyndham.

63.     Ultimately, not only is the developer's relationship with its owners irreparably damaged, through the loss of goodwill and brand damage, but these developers are dramatically financially impacted by the loss of millions of dollars.   As for the timeshare owners, they may face the loss of the monies paid, the loss of their timeshare interests through foreclosure, and/or significant negative impact on their credit, amongst other things.   This odious misconduct has been historically insulated from attack, using shell companies or other similar scams.   In many instances, once the TPE is shutdown via court intervention, a "new" TPE with the same principals is created and put in action.

64.     Over the past decade, these TPE scams have refined their trade and the sub-industry has reached new heights and new level of damages.

65.     TPE scams exist for the sole and improper purpose of inducing consumers, including, without limitation, Wyndham Owners, to breach their valid, binding timeshare agreements with Wyndham, thereby defrauding and harming the consuming public, including, without limitation, Wyndham Owners.

G.      **DEFEDANTS' TPE SCAM.**

66.     Defendants are one such TPE scam.

67.     CLS d/b/a Atlas Vacation Remedies does business utilizing, *inter alia*, a website located at www.atlasvacationremedies.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 – that is, the Springfield Address.

68.     Likewise, CLS d/b/a Principal Transfer Group does business utilizing, *inter alia*, a website located at www.principaltransfergroup.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 – once again, the Springfield Address.

69.     Similarly, MRC does business utilizing, *inter alia*, a website located at www.mutualreleasecorp.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 – yet again, the Springfield Address.

70.     Catalyst was formed by Clapp, who is also its registered agent.  Catalyst does business utilizing, *inter alia*, a website located at www.catalystconsultingfirm.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1205, Springfield, Missouri 65806 – in other words, the office suite next to the Springfield Address.

71.     The Registration of Fictitious Name for 'Atlas Vacation Remedies' on behalf of CLS was signed by Snellen on January 4, 2018.  In the box for "Name and address to return filed document", Hemingway is listed.  *See* Exhibit 3.

72.     The Registration of Fictitious Name for 'Principal Transfer Group' on behalf of CLS was signed by Snellen on January 4, 2018.  In the box for "Name and address to return filed document", Hemingway is listed.  *See* Exhibit 4.

73.     Hemingway also filed a 'Statement of Change of Business Office Address' on behalf of JJ&C Marketing, a copy of which is annexed hereto as Exhibit 22.

74.     Clapp Law and Clapp, meanwhile, misrepresent to the public their actual business address, an improper act for an attorney.  The actual location of Clapp Law, and Clapp, places them in the same building, and next door to, Transfer Group and Vacation Consulting.  Transfer Group and Vacation Consulting are both timeshare exit companies, and Clapp Law and Clapp send numerous letters to Wyndham allegedly representing clients who wish to exit their valid and binding timeshare contracts.  These letters are form letters comprised of one of two types: a 'general representation' letter informing Wyndham that Clapp Law and Clapp represent the Wyndham Owner and that Wyndham should have no further contact with the Wyndham owner, and a 'demand' letter, which is a gibberish letter setting forth alleged misconduct on the part of Wyndham, making a demand for relief, and citing irrelevant and/or inapplicable law (such as 12 C.F.R. § 1014.3(e), which, by definition, does not apply to Wyndham).

75.     Clapp is the owner and managing partner of Clapp Law.

76.     Scroggs is the owner and controller of Transfer Group, Vacation Consulting, VCS, and Real Travel.

77.     Bowe is the director of Transfer Group, owner/partner and controller of Vacation consulting, and owner and controller of Real Travel.

78.     Snellen is the owner and controller of CLS and is a former employee of Scroggs at Transfer Group.

79.     Hemingway is an affiliate of Snellen and Ungaro and has engaged in activities designed to further the scheme set forth herein by assisting in the forming of many of the companies through which Defendants execute their timeshare exit scam.

80.     Chudy and Tucker are the owners and controllers of MRC.

81.     Vacation Consulting recently deleted its website located at www.vacationconsultingservices.com.  Prior to deleting that webpage, there was a page located at www.vacationconsultingservices.com/affiliations, which listed the "VCS Business Affiliations".  A copy of an archived version of this page is annexed hereto as Exhibit 23.  The business affiliations listed are: Florida Vacation Villas Club (which is itself an affiliate of Real Travel), CLS through its fictitious name 'Principal Transfer Group', Clapp Law, and Monterey Financial Services, LLC.

82.     Catalyst also maintains a webpage (located at www.catalystconsultingfirm.com/affiliations/) that lists business affiliations of Catalyst.  A copy of this webpage is annexed hereto as Exhibit 24.  The business affiliations listed are: Clapp Law, CLS through its fictitious name 'Principal Transfer Group', CLS again through its fictitious name 'Atlas Vacation Remedies', The Montgomery Law Firm, LLC, Vacation Safeguard, The Lodges at Indian Point Resort, and surv credit.

83.     Vacation Consulting was sued in a consumer class action for violating the Telephone Consumer Protection Act (TCPA).  *See* Case No. 17-cv-00774, formerly pending in the United States District Court of the Eastern District of Missouri.

84.     Vacation Consulting, in the TCPA lawsuit, denied that it had violated the TCPA, but also brought a third-party claim against its marketing partners, including JJ&C Marketing. Vacation Consulting alleged that any TCPA violation had been committed by its marketing partners, including JJ&C Marketing, and not by Vacation Consulting itself.

85.     JJ&C Marketing is owned and controlled by Josh Ungaro.

86.     Ungaro also owns and controls Transfer for You, Allied, JJ Midwest Marketing, The Mid-West Transfer, and Midwest Transfers, all of which are timeshare exit companies and/or marketing or other companies dedicated to serving the timeshare exit industry, including the other defendants.  For example, Allied's website (www.alliedsolutionsgroup.com) states that "If you ever choose to discharge and release your ownership, [t]he MWT will take back the property if you so choose with our Walk Away Program."  "MWT" is a reference to The Mid-West Transfer and/or Midwest Transfers.  These deed transfer schemes are also known as 'Viking Ships', which is when a 'transfer company' 'transfers' the deed of a timeshare owner to a strawman buyer; the 'transfer company' will transfer tens or hundreds of deeds to a single strawman buyer, who makes no payments on the allegedly transferred interests.  Because the timeshare developer (such as Wyndham) is unaware of the fraudulent transfer, it continues to look to the actual owner of the property to make required payments, even though the actual owner believes (because they were tricked by the 'transfer company') that they had disposed of their timeshare interest.  The end result is the damaging of the credit of the actual owner of the timeshare interest when the unpaid interest is foreclosed upon.

87.     CLS d/b/a Atlas Vacation Remedies and CLS d/b/a Principal Transfer Group are both engaged in false and misleading advertising.  Indeed, the websites for both CLS d/b/a Atlas Vacation Remedies and CLS d/b/a Principal Transfer Group, while appearing superficially to be different are, in many instances, identical.  One example is the 'Customer Reviews' on the Atlas Vacation Remedies website and the 'Customer Testimonials' on the Principal Transfer Group website.  Both the Atlas Vacation Remedies website and the Principal Transfer Group website list the following 'reviews'/'testimonials':

a.   "I would recommend Principal Transfer Group[1] to anyone looking to get out of their timeshare.  We are free and clear of ours and couldn't be happier!  Thank you!  - Susan M.";

b.   "Everyone that I spoke with and everyone that I worked with were very professional, honest and stayed in contact with me throughout the process. I would recommend this company to anyone that needs to get out of their timeshare.  – Pam S."; and

c.   "Our consultant was very understanding of our particular situation and worked with us to find the best fit for us from the program they have in place. I would highly recommend that anyone looking to get out of their timeshare to give them a call. There are no high-pressure sales tactics with this company. We asked for a few days to look things over and call them back. We called them a week later and the deal was still good. We are now timeshare free and could not be happier. Thanks Principal Transfer Group!  - Thomas J.".

Clearly, Susan M., Pam S., and Thomas J. are not real people and these 'customer reviews'/'customer testimonials' are either literally false or deceptively misleading as they 'describe' fake experiences that never occurred by non-existent customers.

88.    Similarly, the Atlas Vacation Rentals website and the Principal Transfer Group website both have a 'Frequently Asked Questions' section that contains identical, or nearly identical, text.  These 'Frequently Asked Questions' contain statements that are either literally false or deceptively misleading, such as:

---

[1] This is not a typo, the 'Customer Review' for 'Susan M.' on the Atlas Vacation Remedies website refers to Principal Transfer Group.

a.  "Will my name be off the Timeshare ownership documents?  Yes!  Ownership is legitimately transferred.  Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as required by resort official governing documents (covenants, conditions, restrictions)."; and

b.  "What happens if you are unsuccessful at exiting me from my timeshare?  In the very rare situation that we are unable to obtain a successful exit opportunity, we proudly stand by our 100% money back guarantee and you will receive a full refund of your fee."

These statements are either literally false or deceptively misleading as CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group do not have a valid, legal, or otherwise legitimate means of assisting consumers in exiting their timeshare obligations.  Instead, CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group cause timeshare owners to be foreclosed upon or engage in fraudulent, unapproved transfers of property through quit-claim deeds, or engage in otherwise fraudulent, unapproved transfers of property utilizing straw-men.  These activities are considered 'successful' exits by CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group and therefore do not qualify a consumer for a refund of the extraordinary fees they pay to CLS d/b/a Atlas Vacation Rentals and/or CLS d/b/a Principal Transfer Group, despite the fact that the activities of CLS d/b/a Atlas Vacation Rentals and/or CLS d/b/a Principal Transfer Group described above cause substantial harm to the consumers (such as by destroying their credit rating) and/or do not actually relieve the consumers of their obligations under their timeshare contracts (such as in the case of fraudulent transfers).

89.     Allied, together with the Ungaro-related companies, is notorious on the Internet for its false and misleading advertising.  The reviews on the Internet are damning:

> We were invited to attend a meeting on how to better use our points with Wyndham. They offered a free dinner and tablet or some other gift certificate for $300. When we got to the hotel we were asked if we were there about the timeshare presentation and taken to a back conference room. The person making the appointment represented they were with Wyndham, when I inquired they said No, they were a 3rd party who wanted to make sure we knew about timeshares and disclosures.
>
> Watch out!!!!
> They are FRAUD, took our information and applied for credit at 5 banks.
> We did not want to go, but the lady on the phone insisted that this was an update for our existing timeshares we already own. when we got there, they told us that they need to check our credit and needed two forms of id. Please do not go or give them your id's. Allied Solution Group is stealing your personal info and id.
>
> They tricked me into attending by claiming that it was important ownership updates that I need to know when they made the call. Even though I told them I only exchanged with the timeshare company they represented, the rep said I still needed to attend because it would affect how I used it. The rep also assured me that they would not be selling anything.
>
> I have been hounded with phone calls over and over again to attend this informational meeting about my Timeshare. I have even asked to be taken off the call list a couple of times. I was told that even if I were taken off of one list I could be on other lists because of the third party call list.

https://www.yelp.com/biz/allied-solution-group-springfield.

90.    Ungaro has been quoted as saying "Third party telemarketing is the key to identifying customers and generating new business." https://medium.com/@alliedsolutiongrp/josh-ungaro-allied-solution-group-1f4663e763f4.    This 'third party telemarketing' is conducted by many companies, including, without limitation, JJ Midwest Marketing and JJ&C Marketing. These marketing companies false and/or deceptively misleading advertisements to the consuming public in forms that will be revealed through the discovery process in this matter.

- 24 -

91.   Transfer Group and Vacation Consulting also utilize or have utilized Ungaro's third-party telemarketing companies.  Transfer Group and Vacation Consulting are timeshare exit company scams that take money from consumers by advertising that they will transfer the consumer's timeshare interest to a buyer using their 'proprietary' methods and sources.  "Once we receive the estoppel, we will go through our numerous resources to find a new owner for your property." http://thetransfergroup.net/faq/.

92.   Transfer Group and Vacation Consulting also advertise that they have "in house attorneys that assist us with the more complicated situations."  Upon information and belief, this is a reference to Clapp Law and Clapp as well as a reference to other timeshare exit company scams where the exit company utilizes a lawyer to force a foreclosure, as outlined above.

93.   In addition to receiving referrals from the aforementioned firms and persons, Clapp and Clapp Law also receive referrals from Real Travel and their related companies.

94.   Annexed hereto as Composite Exhibit 25 is an example of the information package that is provided to consumers by Real Travel at various events designed to attract unwitting consumers to Defendants' timeshare exit scam.  The packet of information contains multiple documents prepared by Clapp Law and Clapp.  Clapp Law and Clapp have created a document titled "RESORT LAW PRACTICE GROUP CLIENT NEXT STEPS".  That document begins by stating "1. YOUR REAL TRAVEL CONSULTANT WILL SEND YOUR FILE TO [CLAPP LAW] WITHIN 24 HOURS" (capitalization in original).  Thus, Clapp (who is the sole partner and controller of Clapp Law) and Clapp Law have created customized documents for use by Real Travel in soliciting consumers, including Wyndham Owners, to sign up for Defendants' timeshare exit scam.  Such an arrangement violates numerous laws and rules, including Florida Bar Rule 4-7.22.

95.     Moreover, the forms created by Clapp and Clapp Law make it clear that Clapp and Clapp Law accept anyone as a client without first reviewing their file (or even meeting the client).  The Clapp Law and Clapp letters state "If you have signed an engagement letter for CBL to represent you regarding obtaining relief from your timeshare mortgage and maintenance fee/assessment obligations, your REAL TRAVEL consultant will send your engagement letter to CBL within 24 hours." (capitalization in original).

96.     Real Travel engages in a variety of false and/or misleading advertising to obtain clients to refer to Clapp and Clapp Law, including:

   a.  advertising on its website that it has met with over "16,000 clients in our 6 years of business" even though Real Travel was formed on June 5, 2018;

   b.  advertising that it has "industry leading consultants" which is untrue;

   c.  repeatedly advertising it is there to help educate consumers, when in reality (and as shown in Composite Exhibit 25) its purpose is to dupe consumers into paying thousands or tens of thousands of dollars on Real Travel's own timeshare products;

   d.  utilizing false reviews by copying many of the alleged 'client testimonials' from VCS's website and Vacation Consulting's website, showing that the 'client testimonials' are false and fabricated;

   e.  advertising that "Real Travel has relationships with developers to get you out of your timeshare interest" when no such relationships exist; and

   f.  a variety of other false and/or misleading statements on its website: www.realtravelus.com.

- 26 -

97.     Clapp and Clapp Law also receive improper referrals from a variety of other sources.  According to the websites cited herein, Clapp is affiliated with CLS (through both of its fictitious names), Vacation Consulting, VCS (Vacation Consulting's alter ego), Transfer Group, and Catalyst.

98.     Vacation Consulting engages in a variety of false and/or misleading advertising to obtain clients to refer to Clapp and Clapp Law, including:

    a. utilizing false reviews by copying many of the alleged 'client testimonials' from VCS's website and Real Travel's website, showing that the 'client testimonials' are false and fabricated;

    b. advertising that "[Vacation Consulting] has relationships with developers to get you out of your timeshare interest" when no such relationships exist;

    c. stating that "[t]t is harder to get out of your timeshare anymore and there are laws in the various state senates that will make it almost impossible for you to transfer your deed to someone else", which is not true;

    d. stating that "[a]nd 650% profit buys a lot of lobbyists" when timeshare companies do not make 650% profit off of a timeshare sale and do not use all of their profits to purchase lobbying services; and

    e. a variety of other false and/or misleading statements on its website: www.vacationconsultingservices.com.

99.     VCS engages in a variety of false and/or misleading advertising to obtain clients to refer to Clapp and Clapp Law, including:

a.   utilizing false reviews by copying many of the alleged 'client testimonials' from Vacation Consulting's website and Real Travel's website, showing that the 'client testimonials' are false and fabricated;

b.   repeatedly advertising it is there to help educate consumers, when in reality its purpose is to dupe consumers into paying thousands or tens of thousands of dollars on VCS's own timeshare products;

c.   advertising that "VCS has relationships with developers to get you out of your timeshare interest" when no such relationships exist;

d.   stating that "[t]t is harder to get out of your timeshare anymore and there are laws in the various state senates that will make it almost impossible for you to transfer your deed to someone else", which is not true;

e.   stating that "[a]nd 650% profit buys a lot of lobbyists" when timeshare companies do not make 650% profit off of a timeshare sale and do not use all of their profits to purchase lobbying services; and

f.   a variety of other false and/or misleading statements on its website: www.vascommunications.com.

100.   Catalyst is an alter ego and front for CLS, Vacation Consulting, VCS, and/or Real Travel, referral source for Clapp and Clapp Law, and beneficiary of the false and/or misleading advertising of the foregoing for at least the following reasons:

a.    Catalyst employs a Chandler Schooler ("Schooler") (who falsely advertises himself as being a "99% Subject Matter Expert"), Schooler's LinkedIn page (a copy of which is annexed hereto as Exhibit 26) states that he is simultaneously 'Senior Customer Service Representative' at Vacation Consulting, 'National

Director' at Catalyst, and 'Owner / Sr. Advisor' at 'Atlas Consulting Group / Catalyst Consulting Firm';

b.   Catalyst also employs an Andrew Hughes ("Hughes") as 'Head of Customer Service', like Schooler, Hughes also works at Atlas Consulting Group ("Atlas Consulting") where he is listed as the sole employee and 'consultant'; the pictures and biographical descriptions for Hughes are identical at both Catalyst and Atlas Consulting:







      c.   Atlas Consulting uses a logo nearly identical to Atlas Vacation Remedies:

 

;

and

      d.   the domain name through which Atlas Consulting operates its website – www.atlasconsultingfirm.net – is owned by Hemingway, *see* Exhibit 27 hereto.

101.   MRC is yet another front and alter ego of for CLS, Vacation Consulting, VCS, and/or Real Travel, referral source for Clapp and Clapp Law, and beneficiary of the false and/or misleading advertising of the foregoing for at least the following reasons:

      a.   MRC shares office space with CLS and its organization documents were filed by Hemingway, just like CLS's fictitious name registrations; and.

      b.   annexed hereto as Composite Exhibit 28 is a packet of information provided by MRC to a potential consumer and Wyndham Owner, the agreement refers to MRC as 'AVR', the same initials as CLS's Atlas Vacation Remedies fictitious name, and includes estoppels addressed to CLS's Principal Transfer Group fictitious name.

102.   MRC also engages in substantial false advertising.  Annexed hereto as Exhibit 28 is an account of a Wyndham Owner who had an interaction with MRC wherein MRC told the Wyndham Owner:

a. "a company named ATLAS, 'which is like the Equifax for timeshare…had flagged that I was having problems with my timeshare and sent my name to the company for help", there is no such company in the timeshare industry, the only ATLAS involved is CLS's Atlas Vacation Remedies fictitious name and Catalyst's Atlas Consulting;

b. "a law (HB453) was passed which 1) took away limit caps as to how much timeshares could increase their annual maintenance fees and 2) told timeshare companies they had to tell their owners bout 'the maintenance fee settlement agreement", there is no such law and, if the statement refers to Florida HB453, it is a blatantly false statement as to what is contained in that law;

c. that when the Wyndham Owner wanted to walk away she was told "'fine, walk away, but we have to report to ATLAS tonight that you came in, were educated about the law, and declined the offer,'" all of which are false statements;

d. that 'ATLAS' would send notices to Wyndham that the Wyndham Owner declined assistance; and

e. when asked about Ovation, MRC stated that "Ovation is a 'scam'" and that "Wyndham will also make [the owner] sign an affidavit saying that [the owner] would be bankrupt and homeless if [the owner] didn't get out of [the] timeshare ownership", and a number of other statements set forth in Exhibit 28, all of which are false.

103.    The advertisements and statements set forth in paragraphs 86 through 102 will be hereinafter referred to as the "False and Misleading Advertisements".

104.    The False and Misleading Advertisements are not puffery.    Thousands of consumers have fallen prey to Defendants' false and/or deceptively misleading advertisements and have retained Defendants to render Defendants' illusory services.   While Defendants will undoubtedly claim that no reasonable person would ever rely on their advertisements, such allegations are clearly inapposite and incompatible with the clear facts and reality.   Those clear facts show the reality of consumer behavior: thousands of consumers have paid Defendants thousands or tens of thousands of dollars each for Defendants' 'guaranteed', 'safe', 'proven', and 'effective' 'process', only to have their timeshare interests terminated, cancelled, defaulted, and/or foreclosed for non-payment.   No rational consumer would pay such sums of monies to a third-party to achieve the same results (timeshare termination, cancellation, defaults, and/or foreclosures for non-payment) they could achieve on their own through the simple act of not paying.   Many timeshare owners, including Wyndham Owners, who pay Defendants for their illusory services ultimately suffer the same fate as any other consumer who simply elects not to make payments on their timeshare contracts; the only difference between many consumers who simply stop paying, and those who retain Defendants' illusory services, is that the latter group of consumers lose additional thousands or tens of thousands of dollars to Defendants on top of what they lose by defaulting on their payment obligations.   Moreover, many of the False and Misleading Advertisements are considered 'inherently deceptive' by the Florida Bar.

105.    Defendants false and deceptively misleading advertisements cause direct harm to Wyndham.   The False and Deceptive Advertisements make false and/or deceptively misleading statements about both Defendants' products and services, and Wyndham's products and services. These statements both deceive consumers, including Wyndham Owners, into retaining Defendants' services, but also damage Wyndham's products and services in the eyes of the

consuming public.  Defendants exist for the sole purpose of interfering in Wyndham's contracts with the Wyndham Owners.  Because Wyndham Owners can be either a customer of Defendants, or a customer of Wyndham, but not both, they are competitors and there is a direct relationship between Defendants false and/or deceptively misleading advertising and harm to Wyndham in that the False and Misleading Advertisements are solely designed to induce Wyndham Owners into retaining Defendants, who then immediately instruct those Wyndham Owners to cease making payments to Wyndham.

106.    All of the individual defendants are personally responsible for the direction and control over their respective entities, which are nothing but alter-egos of the individuals.  Moreover, the companies exist for no proper purpose.  The individual defendants are therefore personally and individually liable for the acts of their respective companies.

**COUNT I**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (against all Defendants)**

107.    Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

108.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

109.    Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

110.    The representations described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own ill-gotten financial gain, for the purpose of influencing

consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

111.    Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

112.    Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to exit their timeshare contracts with Wyndham.  Defendants directly lie to the consuming public by ignoring the existence of the Ovation® Program and ignoring the options available to Wyndham Owners, instead telling consumers that Wyndham will do nothing to work with consumers.

113.    Defendants are operating as direct competitors to Wyndham.  Because of the nature of the TPE scams, a consumer can either be a customer of Wyndham or a customer of a TPE entity, but not both.  This is because TPEs exist solely to induce consumers to breach their timeshare contracts, they have no other purpose.  Thus, once a Wyndham Owner enters into an agreement with a TPE, the sole purpose of that agreement is to cause the breach or termination through other means of that Wyndham Owner's agreement(s) with Wyndham, effectively converting that individual from a Wyndham Customer to a TPE customer.

114.    Wyndham has been or is likely to be injured as a result of Defendants' false and/or misleading statements.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of Defendants' profits, together with interest thereon, an award of court costs, a

determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT II
### Tortious Interference with Contractual Relations (against all Defendants)

115.     Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

116.     This is a cause of action for tortious interference with contractual relations.

117.     Wyndham has contractual relationships with its timeshare owners.

118.     Defendants, by virtue of making misrepresentations to Wyndham Owners regarding their contracts and the existence of the Ovation® Program, and options available to them, have knowledge of these relationships.

119.     As set forth herein, Defendants have intentionally procured the breach of these Wyndham contracts by soliciting Wyndham Owners and persuading them to hire Defendants to help cancel (in reality, breach) their contracts. Upon information and belief, Defendants also procure a breach by telling Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

120.     Defendants do not have justification or privilege in procuring the breach of such contractual relations, as Defendants are "a stranger to the business relationship" between Wyndham and its customers.  See *Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010) (quoting *Salit v. Ruden*, 742 So.2d 381, 385 (Fla. 4th DCA 1999)).

121.     As a result of Defendants' intentional conduct, certain of the breaching owners have terminated their contractual relationships with Wyndham before expiration of the terms of

those contracts. Some of these breaching owners are current on their maintenance fees and would in certain instances keep their timeshare contracts but for Defendants' wrongful actions.

122.    Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

123.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

**COUNT III**
**Violation of Florida's Deceptive and Unfair Trade Practices Act (against all Defendants)**

124.    Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

125.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

126.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

127.    Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

128.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.  Defendants are also engaged in timeshare transfer services as defined in Fla. Stat. § 721.05(52) ("Transfer Interest Services").

129.    Defendants have violated Fla. Stat. § 721.17 by failing to comply with the state requirements for the transfer of interest and resale of transfer agreements pertaining to timeshare entities.

130.    Defendants have offered and executed contracts titled "Deed / Title Transfer Service Contract" with multiple Wyndham customers.

131.    In executing these Deed / Title Transfers, Defendants have never established an escrow account with an escrow agent prior to the agreement as required by Fla. Stat. § 721.17(3)(c)(1).

132.    Defendants are engaged in deceptive and unfair practices, including luring unsuspecting timeshare owners into Defendants under false pretenses and using misrepresentations and high pressure sales tactics to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, cancellation is available to consumers directly from Wyndham at no cost through the Ovation® Program.

133.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA.

134.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

135.    Under Section 510.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2), Fla. Stat. *Id. See also, Kinger v. Weekly World News, Inc.*, 747 F.Supp. 1477, 1480 (S.D.Fla.1990).

136.    As a result of Defendants' actions, Wyndham has been damaged and aggrieved. Wyndham has suffered a loss, including financial loss, damages to its reputation, and loss of goodwill.

137.    Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

138.    Wyndham will continue to suffer irreparable harm to its reputation and goodwill unless Defendants are permanently enjoined from continuing its deceptive and unfair business practices, and, as a result, Wyndham lacks an adequate remedy at law.

139.    Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter preliminary and permanent injunctive relief against all Defendants, award Plaintiffs their costs, and for such other and further relief as the Court deems appropriate.

## COUNT IV
### Civil Conspiracy (against all Defendants)

140.    Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

141.    This is a cause of action for civil conspiracy to interfere with existing contractual relations and/or advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

142.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

143.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with it owners and/or causing its owners to breach their contractual agreements with Plaintiffs.  Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs business relations or to induce Plaintiffs' customers to breach their contractual agreements.

144.    Defendants conspired to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners.

145.    Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth hereinabove.

146.    As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs before the expiration of the terms of those contracts.

147.    Defendants did not have any justification or privilege in procuring the breach of such business relationships. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

148.    Defendants acted willfully and with malice in taking these actions.

149.    Defendants are jointly and severally liable to Plaintiffs for Damages.

150.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT V
## Violation of Florida Timeshare Act (against all Defendants)

151.    Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

152.    This is a cause of action arising under the Florida Vacation Plan and Timesharing Act, Chapter 721, Florida Statutes.

153.    Defendants are engaged in timeshare interest transfer services as defined in Fla. Stat. § 721.05(52) as they are collectively engaged in offering and providing goods and/or services relating to an offer or agreement to transfer ownership of a consumer resale timeshare interest, or assistance with or a promise of assistance in connection with the transfer of ownership of a consumer resale timeshare interest.

154.    Defendants have violated the Florida Vacation Plan and Timesharing Act, Fla. Stat. § 721.17, by:

    a.    failing to include in all agreements with Wyndham Owners the language required by Fla. Stat. § 721.17(3)(b);

    b.    failing to maintain and utilize the escrow account required by Fla. Stat. § 721.17(3)(c);

    c.    requiring payment from Wyndham Owners immediately upon entering into an agreement with any of the Defendants and not after services have actually been performed, as required by the statute; and

       d.      transferring timeshare interests to a transferee that does not have the ability, means, or intent to pay all assessments and taxes associated with the timeshare interest.

155.    Because Clapp Law charges more than $600 for its services, it is not exempt pursuant to Fla. Stat. § 721.17(3)(h)(2).

WHEREFORE, Plaintiffs respectfully request this Court enter final judgment in their favor and against Defendants, jointly and severally, for its actual damages, together with interest thereon, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

## COUNT VI
### Tortious Interference with Current and Prospective Business Relationships
### (against all Defendants)

156.    Wyndham adopts and realleges paragraphs 1 through 106 above as if fully set forth herein.

157.    This is a cause of action for tortious interference with advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs.

158.    Plaintiffs have advantageous business relationships or prospective business relationships with identifiable third parties, specifically the Wyndham Owners. Plaintiffs expend considerable time and resources developing and cultivating current and prospective business relationships with its owners.

159.    Defendants have actual, constructive, and/or specific knowledge of the relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis under which Defendants sought to establish a relationship with the Wyndham Owners. Indeed, if it were not for the existence of the

relationships between Wyndham and the Wyndham Owners, Plaintiffs would have no reason to exist.

160. Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused them to breach and/or terminate their relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

161. As stated above, Defendants have intentionally and without justification interfered with Plaintiffs' relationships by convincing Wyndham Owners to immediately stop making any further payments under their contracts without any legal basis and/or by making frivolous and unsupported allegations against Wyndham.

162. Defendants have utilized improper and/or illegal means to interfere with Plaintiffs' business relations.

163. Defendants' actions were done with improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

164. As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationship with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

165.     Defendants did not have any justification or privilege in procuring the breach of such business relationships and their interference with Plaintiffs' business is willful and malicious.

166.     Defendants' interferences inference involves deceit, fraud, undue influence, misuse of inside information, sharp business practices, breach of fiduciary relationships, overreaching conduct, violation of ethical rules and/or constitutes unfair competition.

167.     As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

168.     Plaintiffs are entitled to damages against all Defendants jointly and severally.

169.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully requests this Court enter final judgment in their favor and against Defendants, jointly and severally, for their actual damages, together with interest thereon, punitive damages, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

## COUNT VII
### Request for Injunctive Relief (against all Defendants)

170.     Wyndham adopts and realleges paragraphs 1 through 169 above as if fully set forth herein.

171.     This is a cause of action for temporary and permanent injunctive relief.

172.     Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to immediately terminate the Wyndham Owners' contracts with Plaintiffs is harming Plaintiffs and constitutes tortious interference with Plaintiffs' existing contractual and advantageous business relationships.

173.    Defendants have engaged, continue to engage, and/or intend to further engage in the conduct described above.

174.    Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

175.    The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation.  These defaults result in loss of good will and damages to the customer relationship with other Wyndham Owners that are not in default and enjoying their Wyndham Contracts.  Non-Defaulting Wyndham Owners will be forced to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

176.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity. Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

177.    There is a substantial likelihood that Plaintiffs will prevail on the merits of their claims against Defendants.

178.     The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' advantageous business relationships outweigh the harm, if any, that an injunction would cause to Defendants.

179.     The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and their timeshare owners, and by restraining the disruptive and tortious actions committed by Defendants.

WHEREFORE, Plaintiffs demand a temporary and permanent injunction be entered against Defendants and their agents, representatives, employees, affiliates, and any others acting in concert or participating with Defendants and prohibiting Defendants from: (1) publishing false and misleading misrepresentations on their website or in any other electronic or print media or materials regarding Plaintiffs' owners' cancellation of their timeshare interest without any legal basis; (2) contacting or soliciting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual and business relationships with their owners; and (3) taking or making any distributions, expenditures, or transfers, other than in the usual course of business, from any entity that Defendants directly, indirectly, or effectively control, including, but not limited to, the named Defendant entities, or any such entity that has received any funds from any of the Defendants.  Plaintiffs further seek an award of as well their costs and attorneys' fees and for all other relief this Court deems just and proper.

Dated: September 14, 2018

/s/ Alfred J. Bennington, Jr.
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

ORLDOCS 16375879 5